UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------- X

UNITED STATES OF AMERICA,

Plaintiff,

-v.-

ALL THAT LOT OR PARCEL OF LAND LOCATED AT 19 DUCK POND LANE, SOUTHAMPTON, NEW YORK 11968, TOGETHER WITH ITS BUILDINGS, APPURTENANCES, IMPROVEMENTS, FIXTURES, ATTACHMENTS, AND EASEMENTS, *et al*

Defendants-*in-rem*.

----------------------------------

Voxi Management Corp. and Medallion Inc.,

Claimants.

---------------------------------- X

23 Civ. 1545 (JGLC)

**MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10007

LAWRENCE H. FOGELMAN
JESSICA GREENWOOD
JENNIFER JUDE
LISABETH MENDOLA-D'ANDREA
JOSEPH ZABEL
Assistant United States Attorneys
*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 2

A. The Subject Properties ..... 2

B. The Relationship between Vekselberg and Voronchenko ..... 2

C. The Claimants and Their Corporate Structures ..... 3

1. Corporate Structure of Medallion ..... 3

2. Before Sanctions, Vekselberg Was Openly Recognized as the Ultimate Beneficial Owner of Medallion ..... 5

3. Medallion Was Managed by Entities and Individuals That Also Managed Other Vekselberg Entities ..... 7

4. Corporate Structure of Voxi ..... 9

5. Vekselberg Was the Ultimate Beneficial Owner of Voxi Through January 20, 2022 ..... 10

6. Voxi Was Managed by Vekselberg Entities and Individuals ..... 10

D. The Acquisition and Maintenance of the Subject Properties ..... 11

1. The Park Avenue Apartments ..... 11

2. The Southhampton House ..... 11

3. The Fisher Island Condo ..... 12

4. The Fisher Island Penthouse ..... 12

5. Pre-Sanctions Funding for the Acquisition and Maintenance of the Subject Properties ..... 13

E. Vekselberg's Designation as an SDN on April 6, 2018 ..... 11

F. Post-Sanctions Transactions Related to the Subject Properties ..... 16

1. Post-Sanctions Transfers Used To Pay for Expenses Relating to the Subject Properties ..... 16

2. The Illegal Transfer of Ownership of Medallion to Smile ..... 21

3. The Illegal Transfer of the Penthouse from Voxi to Voronchenko's Relative ....... 23

G. The Indictment of Voronchenko and His Flight from Justice ............................. 24

H. The Government's Forfeiture Action................................................................ 25

STATUTORY AND REGULATORY FRAMEWORK ..................................................... 26

I. IEEPA ........................................................................................................... 26

II. Forfeiture......................................................................................................... 28

ARGUMENT ................................................................................................................ 29

I. Summary Judgment Standard ......................................................................... 29

II. Discussion ........................................................................................................ 31

A. The Defendants-*in-rem* Are Forfeitable as Proceeds of IEEPA Violations ..... 32

1. Voronchenko Violated and Conspired to Violate IEEPA........................ 38

2. The Subject Properties Are Proceeds Traceable to the IEEPA Violations 38

B. The Defendants-*in-rem* Are Subject to Forfeiture as Property Involved in International Money Laundering and a Conspiracy to Commit the Same ....... 42

1. Voronchenko and Other Conspirators Engaged in International Promotional Money Laundering ........................................................... 43

2. The Defendants-*in-rem* are Property Involved in International Promotional Money Laundering ..................................................................... 44

CONCLUSION ............................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 30

*Berger v. United States*,
87 F.3d 60 (2d. Cir. 1996) ........ 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 30

*Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*,
609 F.3d 111 (2d Cir. 2010) ........ 34

*Gallo v. Prudential Residential Servs.*,
22 F.3d 1219 (2d Cir. 1994) ........ 30

*Glob. Relief Found., Inc. v. O'Neill*,
315 F.3d 748 (7th Cir. 2002) ........ 34

*Golden Pac. Bancorp. v. FDIC*,
375 F.3d 196 (2d Cir. 2004) ........ 30

*Holy Land Found. for Relief & Dev. v. Ashcroft*
("Holy Land II"), 333 F.3d 156 (D.C. Cir. 2003) ........ 34

*In re 650 Fifth Ave. & Related Props.*,
2013 WL 5178677 (S.D.N.Y. Sept. 16, 2013) ........ 27, 38

*In re 650 Fifth Ave. & Related Props.*,
830 F.3d 66 (2d Cir. 2016) ........ 32, 42, 43

*In re 650 Fifth Avenue & Related Props.*,
777 F. Supp. 2d 529 (S.D.N.Y. 2011) ........ 29, 39, 42, 44-45

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005) ........ 30

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ........ 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........ 31

*Matter of Seizure & Search of Motor Yacht Tango*,
597 F. Supp. 3d 149 (D.D.C. 2022) ........ 33

*Morris v. Lindau*,
196 F.3d 102 (2d Cir. 1999) ........ 30

*Quinn v. Syracuse Model Neighborhood Corp.*,
613 F.2d 438 (2d Cir. 1980) ........ 31

*Scott v. Harris*,
550 U.S. 372 (2007) ........ 30

*United States v. All Assets of G.P.S. Auto. Corp.*,
66 F.3d 483 (2d Cir. 1995) ........ 29

*United States v. Approximately Five Hundred Forty-One Thousand Nine Hundred Fifty-Three Dollars & Zero Cents, No. 23-CV-9585*
(MKB) (PK), 2025 WL 923412 (E.D.N.Y. Mar. 27, 2025) ........ 42

*United States v. Banki*,
685 F.3d 99 (2d Cir. 2012) ........ 27

*United States v. Borromeo*,
995 F.2d 23 (4th Cir. 1993) ........ 42

*United States v. Collado*,
348 F.3d 323 (2d Cir. 2003) ........ 30

*United States v. Dennis*,
237 F.3d 1295 (11th Cir. 2001) ........ 41

*United States v. Frank*,
354 F.3d 910 (8th Cir. 2004) ........ 41

*United States v. Grant*,
2008 WL 4376365 (S.D.N.Y. Sept. 25, 2008) ........ 28, 38, 41

*United States v. Homa Int'l Trading Corp.*,
387 F.3d 144 (2d Cir. 2004) ........ 27

*United States v. Kenner*,
443 F. Supp. 3d 354 (E.D.N.Y. 2020) ........ 40

*United States v. Ladum*,
141 F.3d 1328 (9th Cir. 1998) ........ 41

*United States v. Levine*,
970 F.2d 681 (10th Cir. 1992) ........ 41

*United States v. Miller*,
911 F.3d 229 (4th Cir. 2018) ........ 44

*United States v. Morelli*,
169 F.3d 798 (3d Cir. 1999) ........ 41

*United States v. One 1987 Mercedes Benz*,
820 F. Supp. 248 (E.D. Va. 1993) ........ 45

*United States v. One Red 2003 Hummer H2 VIN: 5GRGN23U93H118675*,
234 F. Supp. 3d 415 (W.D.N.Y. 2017) ........ 42

*United States v. Pierce*,
224 F.3d 158 (2d Cir. 2000) ........ 43

*United States v. Schlesinger*,
261 Fed. Appx. 355 (2d Cir. 2008) ........ 29, 40

*United States v. Schlesinger*,
396 F. Supp. 2d 267 (E.D.N.Y. 2005) ........ 45

*United States v. Seabrook*,
661 F. App'x 84 (2d Cir. 2016) ........ 28

*United States v. Seher*,
562 F.3d 1344 (11th Cir. 2009) ........ 29

*United States v. Torres*,
703 F.3d 194 (2d Cir. 2012) ........ 28, 29, 41

*United States v. Yusuf*,
536 F.3d 178 (3d Cir. 2008) ........ 41

*Wyler v. United States*,
725 F.2d 156 (2d Cir. 1983) ........ 31

*Zellner v. Summerlin*,
494 F.3d 344 (2d Cir. 2007) ........ 30-31

**Statutes**

18 U.S.C. § 2, ........ 25

18 U.S.C. § 371 ........ 25

18 U.S.C. § 981 ........ passim

18 U.S.C. § 985 ........ 25

18 U.S.C. § 1956 ........ passim

50 U.S.C. § 1601 ........ 26

50 U.S.C. § 1701 ........ 26

50 U.S.C. § 1702........ 26, 34

50 U.S.C. § 1705 .......... 24, 26, 32

**Other**

31 C.F.R. § 589.201 .......... passim
31 C.F.R. § 589.210 .......... 21, 27
31 C.F.R. § 589.213 .......... 28
31 C.F.R. § 589.303 .......... 40
31 C.F.R. § 589.321 .......... 34
31 C.F.R. § 589.331 .......... 34
31 C.F.R. § 589.411 .......... 35, 27, 35, 36
31 C.F.R. §§ 589.201 .......... 27
Federal Rule of Civil Procedure Rule 30 .......... passim
Federal Rule of Civil Procedure Rule 56 .......... passim

The Government respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure with respect to the forfeitability of the Defendants-*in*-*rem*.

## PRELIMINARY STATEMENT

This matter is a civil *in rem* forfeiture action in which the United States seeks to forfeit real properties located in New York and Florida currently worth approximately $75 million (the "Defendants-*in-rem*" or the "Subject Properties"). Between 2008 and 2017, shell companies beneficially owned and controlled by Viktor Vekselberg, a Russian oligarch, bought the Defendants-*in-rem*. When the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") sanctioned Vekselberg on April 6, 2018, the Defendants *in-rem* became blocked property and any provision of funds or services to Vekselberg was prohibited. Despite these sanctions, Vekselberg's long-time friend Vladimir Voronchenko caused U.S. dollar transfers into the U.S. to maintain and retain the Defendants-*in-rem* for Vekselberg's benefit. In particular, after April 6, 2018, Voronchenko and others (i) sent international wire transfers totaling approximately $4.2 million for the payment of expenses to maintain and retain the Defendants-*in-rem* and (ii) engaged in restructuring transactions to transfer ownership of the shell companies—and therefore ownership of the Defendants-*in-rem*—from Vekselberg to Voronchenko. Based on facts not genuinely in dispute, the Defendants-*in-rem* are subject to forfeiture to the Government as both the proceeds of violations of the International Emergency Economic Powers Act ("IEEPA") and as property involved in international money laundering in promotion of IEEPA violations.

## STATEMENT OF FACTS[1]

### A. The Subject Properties

The Defendants-*in-rem* comprise the following properties:

1. 19 Duck Pond Lane, Southampton, New York (the "Southampton House"), purchased by Medallion on February 21, 2008;

2. Unit 21 of 515 Park Avenue, New York, New York ("Park Avenue-1"), purchased by Medallion on February 15, 2008;

3. Unit 2I of 515 Park Avenue, New York, New York 1 ("Park Avenue-2" and, together with Park Avenue-1, the "Park Avenue Apartment"), purchased by Medallion in December 20, 2012;[2]

4. Units 7182 and 7183 of Palazzo Del Mare, Fisher Island Drive, Miami Beach, Florida (the "Fisher Island Condo"), purchased by Medallion on July 8, 2010; and

5. Unit 7002 PH2 of Palazzo Del Sol, Fisher Island Drive, Miami Beach, Florida (the "Fisher Island Penthouse" or the "Penthouse"), purchased by Voxi (by assignment from Medallion) on May 1, 2017.

### B. The Relationship between Vekselberg and Voronchenko

Viktor Vekselberg is a Russian billionaire who has been recognized as one of the world's richest individuals. He built his wealth through investments in the energy and industrial sectors. *See* Declaration of Lawrence H. Fogelman ("Fogelman Decl."), dated November 25, 2026, Ex. 1 at US00002476-77.[3] Vladimir Voronchenko (then a U.S. person who resided in the United States, *see* Ex. 89; Declaration of Ryan T. Fannon, dated November 24, 2026 ("Fannon Decl.") ¶ 3) is Vekselberg's long-time friend. The two men grew up in the same small city in western Ukraine,

[1] The description of undisputed material facts set forth herein is based upon the pleadings in this matter, including admissions by the claimants; admissible documents from the public record and from discovery; and from relevant deposition testimony in this matter. In accordance with Local Civil Rule 56.1, the Government is also filing a Statement of Undisputed Material Facts in Support of Motion for Summary Judgment by the Government.

[2] For the avoidance of doubt, Unit 2I is "2i."

[3] Unless otherwise specified, all citations to "Exhibit" or "Ex." are to the exhibits to the Fogelman Declaration.

went to school together, and share a close bond. *See* Ex. 2 at 10:11–18:13. Voronchenko has described Vekselberg as his “very, very close friend.” *Id.* at 18:6. In a letter submitted on Vekselberg’s behalf to a condominium board in connection with the purchase of Park Avenue-1, explaining that Voronchenko would be occupying Park Avenue-1, Voronchenko is referred to as Vekselberg’s “cousin, friend, and business colleague.” Ex. 1 at US_00002473.

Vekselberg and Voronchenko have also conducted business together, including projects related to the Link of Times Foundation, an entity Vekselberg created to repatriate Russian art. *Id.* at 00002479, 00002485-86. Voronchenko, an avid art collector, provided guidance to Vekselberg and brought the idea of purchasing the Forbes Fabergé Egg collection to Vekselberg’s attention. Ex. 3. Voronchenko has served as President of the Link of Times Foundation. Ex. 1 at 00002483-86. Voronchenko was also involved in the founding of Vekselberg’s Faberge Museum, which opened in 2013. Ex. 3.

### C. The Claimants and Their Corporate Structures

Beginning in or around 2007, Vekselberg began acquiring the Subject Properties using two shell companies—Medallion, Inc. (“Medallion”) and Voxi Management Corp. (“Voxi”), which are the principal claimants in this case. *See infra* note 20.

#### 1. Corporate Structure of Medallion

Medallion is a Panamanian corporation formed on October 13, 2005. Ex. 4; Ex. 1 at US_00002475. Two weeks after its formation, its shares were registered to Grierson Investing Corp. (“Grierson”), which held Medallion until January 24, 2019. Ex. 5. During this period, Medallion was owned 100 percent by Grierson, which in turn was owned by Lamesa Group Holding S.A. (“Lamesa Group”) (95 percent) and Lamesa Finance Inc. (“Lamesa Finance”) (5 percent). Lamesa Finance was itself wholly owned by Lamesa Group, which was in turn wholly

owned by the Lamesa Foundation (the "Lamesa Foundation").[4] Ex. 6 at Response to Interrogatory Request 3. Vekselberg is a "beneficiary" of the Lamesa Foundation. Ex. 6 at Response to Interrogatory Request 5. [redacted] Ex. 8 at 3.[5] [redacted] Ex. 8, Attachment C ¶ 10.

In January 2019, Grierson transferred ownership of Medallion to Lamesa Group, Ex. 5, thereby eliminating Grierson from the Medallion ownership structure but leaving the ultimate beneficial ownership of the company unchanged. Lamesa Group held the shares of Medallion until August 2019, when Smile Holding Ltd. ("Smile") illegally acquired them in the debt restructuring transactions described *infra*. The Medallion ownership structure prior to the acquisition by Smile is reflected in this diagram:

---

4 [redacted] Ex. 8 at 2.

5 [redacted]




*See* Ex. 9 (the "Lorry Report"), Figure 1.

### 2. Before Sanctions, Vekselberg Was Openly Recognized as the Ultimate Beneficial Owner of Medallion

Before Vekselberg was sanctioned, he was consistently identified as the ultimate beneficial owner ("UBO") and controlling principal of Medallion in a number of different contexts by Vekselberg, Voronchenko, and Medallion representatives. Specifically:

- In response to an inquiry from the Board of Managers of 515 Park Avenue about who was behind the purchase of Park-Avenue-1, Medallion's attorney Robert Wise responded with a letter dated November 7, 2007, signed by a director of Medallion stating that Vekselberg "is the Ultimate beneficial owner of the Company." Ex. 1 at US_00002475.

- In connection with the acquisition of Park-Avenue-1, Medallion's attorney Robert Wise told Douglas Elliman, a real estate company involved in the transaction, in a letter dated January 18, 2008, that "the owner of Unit 21[] will be Medallion, Inc. *while the beneficial owner will be Mr. Viktor Vekselberg*," and that the occupant of the unit would be "his cousin, friend, and business colleague Vladimir Voronchenko." Ex. 1 at US_00002473 (emphasis added).

- [redacted] Ex. 11.

- Around the time that Medallion purchased the Fisher Island Condo, Voronchenko and his family applied for membership in the Fisher Island Club, a nearby country club. [redacted] Ex. 13.

- In connection with applications for new insurance policies in 2010 on the Southhampton House and Park Avenue-1 to replace the AIG policies (referenced above), insurance company Privilege Underwriters Reciprocal Exchange ("PURE") asked Medallion to submit answers to a "Corporate Name, Trust or LLC Questionnaire." In response to a question asking Medallion to provide "the Principal/beneficial owners names and occupation," Medallion responded: "One shareholder – Viktor Vekselberg, Russian citizen." Ex. 14 at US_00090659-60. In January 2010, PURE described "Viktor" as a "Russian Oil Billionaire," and discussed "his" "$2M Park Ave Condo and $7.8M Southhampton home." Ex. 15. The underwriting documents from January 2010 likewise reflect Vekselberg's ownership of the properties: "Approval: Homeowners – New York, Vekselberg Viktor." Ex. 16.

- In 2012, Voronchenko testified in a deposition as part of a dispute with an architecture firm over a renovation of Park Avenue-1. He testified that he did not own Medallion and he disclaimed having an ownership interest in the apartment; rather, Voronchenko testified, it was owned by a chain of entities ultimately owned by Vekselberg and Voronchenko's family was living in Park Avenue-1 because he was Vekselberg's close friend. Ex. 2 at 9:9-18:13 (testifying that Vekselberg was the "main owner of this huge group," including Medallion, and that he was allowed to reside in the properties for free because "[w]e are working together where -- we are really very close friends."). Voronchenko also testified that while he used the Southhampton House he did not own it and "do[esn't] have any property in the United States." Ex. 2 at 286:6-288:5.

- In that same litigation, Garry Braverman, who was deposed as the Rule 30(b)(6) witness for Medallion, testified that Vekselberg was both the "principal" and the "owner" of Medallion. Ex. 17 at 13:16-14:4, 34:8-9.[6] Braverman also testified in substance that Vekselberg made decisions on behalf of Medallion with respect to Park Avenue-1, such as having Braverman find companies to assist with the apartment renovation, *id.* at 22:17-25; setting the budget for the renovation, *id.* at 62:10-63:15; setting the timeline for completion of the renovation, *id.* at 21:24-22:8; 24:5-24:19; and giving Braverman the authority to cancel the renovation contract, *id.* at 18:6-21:23. Braverman further testified that prior to

---

[6] Ex. 17 at 13:16-14:4 ("Q. Did you ever provide any services for Medallion, Inc.? A. As a favor to a friend. . . . Q. And to which friend are you referring? A. Vladimir Voronchenko […] And a principal of Medallion. Q. Who is that principal? A. Victor Vekselberg."); *id.* at34:8-9 ("Q. Who owns Medallion? A. I believe Victor Vekselberg does.").

Medallion's purchase of Park Avenue-1, Voronchenko had told Braverman that Vekselberg intended to purchase Park Avenue-1, *id.* at 38:17-21.

- In 2017, Medallion completed a KYC form for the bank UBS. In the form, Medallion provided information to the bank about the Lamesa Foundation, the entity holding (through other entities) the shares of Medallion (as depicted in the diagram above). [redacted] Ex. 18. [redacted] Ex. 19. [redacted] Exs. 18, 19.

### 3. Medallion Was Managed by Entities and Individuals That Also Managed Other Vekselberg Entities

Medallion was operated by companies and individuals that also operated other Vekselberg entities, including but not limited to A.J.K. Bureau of Consultants, R.E.A.M. Management Limited (Cyprus), Jean-Pierre Haroutounian, and Alcides Higuera.

Medallion was managed by a professional service firm, A.J.K. Bureau of Consultants ("A.J.K. Consultants"), which provided it with directors, officers, and administrative and management support. Exs. 20-21. A.J.K. Consultants was authorized to act on behalf of Medallion, including by executing documents, maintaining accounts, and managing corporate formalities pursuant to instructions from affiliated parties. Exs. 23-25. As part of this arrangement, Medallion maintained a UBS bank account in Switzerland and, through 2013, designated Angela Constantinou, an employee of A.J.K. Consultants, as the receiver for wires to this UBS account. Exs. 25-28. Medallion was also serviced by A.J.K. Management Services, A.J.K. Secretarial Services, and A.J.K. Administration Services Inc., as well as the individuals Alcides Higuera and Fredis Gonzalez. Ex. 29. Higuera and Gonzalez are also officers of Lamesa Transport LLC, that "appears to be an affiliate of other shell companies owned or controlled by Vekselberg." Ex. 30.

The A.J.K. entities performed work on behalf of other Vekselberg entities as well. In or around April of 2007, A.J.K. Consultants became the service provider for the Vekselberg entities Grierson, Lamesa Finance, and Lamesa Arts Inc., Inc., in addition to Medallion. Exs. 7, 31. Moreover, Vekselberg's entities and the A.J.K. entities shared personnel. For example, Jean-Pierre Haroutounian, an employee of A.J.K. Secretarial Services, Ex. 32, served as a director for the Vekselberg entities Grierson and Lamesa Finance. Exs. 33, 34. Similarly, Yiannakis Papatheodorou signed documents both on behalf of Vekselberg entity Lamesa Group as well as A.J.K. Administration Services Inc. Exs. 35, 36.

Another group of Medallion's managers and directors are connected to R.E.A.M. Management Limited (Cyprus) ("R.E.A.M. Management"), which is affiliated with Vekselberg and shares the same address as Vekselberg's company Renova.[7] R.E.A.M. Management was authorized to direct the use of Medallion's funds,[8] and did so through Kirill Kiosa, an accountant employed by Vekselberg's Lamesa Foundation, Ex. 39 at 38:13-15, who used a R.E.A.M. Management (Russia) email address, Ex. 40. Kiosa managed various aspects of Medallion, and acted as the controller of Medallion's funds.[9] For example, when Medallion's attorney Robert Wise required funds for property expenses, the authorization process generally ran: Wise to Sergey to Kiosa for approval.[10]

---

[7] Ex. 38 at 337:24-339:2. At the same time that it added Vekselberg to the SDN list, OFAC also added the Renova Group, the collection of companies Vekselberg founded and owns. *See* Ex. 37.

[8] Mr. Kiosa directed audits for Medallion through Sergey Voronchenko ("Sergey"), Voronchenko's son. *See* Ex. 39 at 141:2-12.

[9] For example, the Medallion management agreement with A.J.K. Bureau of Consultants granted Kirill Kiosa "unlimited authority to give consultations concerning any and all decisions and/or actions of the directors of the Company". *See* Ex. 20 at USAO_000385.

[10] The record includes examples of Kiosa exercising control over tax payment authority, as well as other budgetary considerations related to the properties. *See* Exs. 40-42.

In addition, from 2013 through 2018, another employee of R.E.A.M. Management, Oxana Vasileva, became the receiver of incoming wires to the Medallion UBS account. Ex. 43 (compilation of wires). Vasileva was also a director of the Vekselberg entity Lamesa Group. Ex. 44.

In addition, Alcides Higuera, who at one point served as the Director/President of Vekselberg's Lamesa Group, Ex. 45 at USAO_000328, also served as a Director and President of Medallion starting in 2018. Ex. 29. Likewise, Fredis Gonzalez, who had also served a Director of Lamesa Group and a Director of Vekselberg's Grierson, Exs. 46, 47, became a Director and Secretary of Medallion starting in July of 2018, after Vekselberg's designation as an SDN, Ex. 29.

In sum, employees, offices, and directors of other Vekselberg entities helped manage the financial affairs of Medallion, which further demonstrates that Medallion was beneficially owned by, and controlled by, Vekselberg.

#### 4. Corporate Structure of Voxi

Voxi is a corporation formed in the British Virgin Islands on March 27, 2014. Ex. 48. From formation through December 15, 2014, Medallion held 100% of Voxi's shares. Ex. 49. On December 15, 2014, Medallion's shares in Voxi were cancelled and new shares were issued to Lamesa Group, which then held 100% of Voxi's shares from December 15, 2014, through January 20, 2022. Ex 50. As discussed below, on January 20, 2022, Lamesa Group transferred 100 percent of Voxi's shares to Ilya Zlotnyk, a relative of Voronchenko, for a stated purchase price of $10,000. *See infra* Statement of Facts ("SOF") § F.3. The following diagram reflects the ownership structure of Voxi from inception through January 20, 2022. Lorry Report at 12.[11]

[11] The figure uses "Lamesa Entities" to refer to Lamesa Group and Grierson. The dashed line between LGI and the Lamesa Foundation indicates a beneficiary relationship.




**5. Vekselberg Was the Ultimate Beneficial Owner of Voxi Through January 20, 2022**

As demonstrated in Figure 2 above, ownership of Voxi was held from inception through January 20, 2022, by Vekselberg entities and ultimately by the Lamesa Foundation, of which Vekselberg's 100% owned company LGI was the first beneficiary. [redacted] *See* Ex. 19. [redacted] *Id.*

**6. Voxi Was Managed by Vekselberg Entities and Individuals**

Voxi employed the same Vekselberg-related managers as Medallion. Voxi employed A.J.K. Corporate Management Inc. as a Director from 2014 to 2018, and A.J.K. Corporate Administration Inc. as a Secretary during the same time period. Ex. 51; *see also* Ex. 22. Voxi also had R.E.A.M. Management listed as a Director from April 6, 2018 to July 12, 2018, *id.*, demonstrating further overlap with Vekselberg entities. Moreover, Alcides Higuera—a Director

and President of Medallion and the Lamesa Group—served as a Director and President of Voxi starting in July of 2018, and Fredis Gonzalez—a Director of the Lamesa Group, Grierson, and Medallion—served as a Director and Secretary of Voxi starting in July of 2018. *Id.*

### D. The Acquisition and Maintenance of the Subject Properties

As detailed herein, Medallion or Voxi purchased each of the Subject Properties, and have held title to these properties through the present.

#### 1. The Park Avenue Apartments

In October 2007, Hermitage (a Voronchenko entity, *see* Ex. 6 at Response to Interrogatory 18(g)) contracted to purchase Park Avenue-1 for $10,950,000, and made a down payment of $1,095,000. Exs. 52, 53. A few months later, on January 10, 2008, Hermitage assigned all of its rights under the purchase contract to Medallion, a Vekselberg entity. Ex. 54.[12] The purchase closed on February 15, 2008, with Medallion as grantee obtaining title to the property. Ex. 55. The balance of the purchase price was financed by Medallion using a loan that Grierson (a Vekselberg entity) provided to Medallion two days before the closing, on February 13, 2008. Ex. 71 (the "Hinton Report") ¶ 41. Medallion subsequently purchased a second adjacent unit at 515 Park Avenue (Unit 2-I) for $611,000 in December 2012. Ex. 56; Ex. 6 at Response 18(c).

#### 2. The Southhampton House

In December 2007, Medallion contracted to purchase the Southhampton House for $11,440,000.72. Ex. 57. The transaction closed on February 21, 2008, at which point Medallion acquired title to this property. Ex. 58. Voronchenko subsequently entered into agreements to lease this property from Medallion, although there is no evidence that any lease payments were ever made. Exs. 60, 61, 62; Hinton Report ¶ 87.

[12] There is no reservation of beneficial interest by Hermitage or Voronchenko reflected in the assignment document.

### 3. The Fisher Island Condo

In April 2010, Medallion contracted to purchase the Fisher Island Condo (comprised of Units 7182 and 7183) for approximately $2,750,000 (Unit 7182) and $3,200,000 (Unit 7183). Ex. 59; Ex. 6 at Response to Interrogatory No. 18(i). Medallion closed and took title to Units 7182 and 7183 on July 8, 2010. Ex. 59 at USAO_000476-77. Units 7182 and 7183 were later combined into a single residential unit. Ex. 118. As with the Southhampton House, Voronchenko and his family members subsequently entered into agreements to lease the Fisher Island Condo from Medallion, although there is no evidence of any lease payments being made. Ex. 63 (compilation of lease agreements); Hinton Report ¶ 87.

### 4. The Fisher Island Penthouse

In April 2014, Medallion entered into a purchase agreement to buy the Penthouse, Unit 7002 at Palazzo del Sol, Fisher Island for $31,261,545.00. Ex. 64. At the time, the Penthouse was being built and was not yet completed. The agreement was amended multiple times between 2014 and the May 2017 closing, including a series of extensions to the closing date. Exs. 65-69. The purchase closed on May 1, 2017. In conjunction with the May 1, 2017 closing, Medallion assigned all of its rights under the purchase agreement to Voxi, which assumed the purchase obligation, and title was conveyed to and recorded in Voxi's name. Ex. 69 (reflecting that Medallion transferred all its rights and obligations under the Purchase Agreement to Voxi Management and Voxi assumed all obligations as Purchaser).

A summary chart providing the date and purchase price for each of the Subject Properties is below:

| Property Name | Date | Purchase Price | Notes |
|---|---|---|---|
| 515 Park Ave Unit 21 | 2/15/2008 | $11,123,406 | Combined with Unit 2-I |
| Duck Pond | 2/21/2008 | $11,832,981 | |
| Fisher Island Unit 7182 | 7/8/2010 | $2,760,000 | Combined with Unit 7183 |
| Fisher Island Unit 7183 | 7/8/2010 | $3,243,641 | Combined with Unit 7182 |
| 515 Park Ave Unit 2-I | 12/20/2012 | $611,000 | Combined with Unit 21 |
| Penthouse Unit 7002 | 4/27/2017 | $31,261,545 | Purchase date reflects final payment |
| | Total | $60,832,573 | |

*See* Lorry Report at 23; Ex. 6 at Response to Interrogatory 18; Ex. 70 at Response to Interrogatory 13; Hinton Report ¶¶ 39-64.

### 5. Pre-Sanctions Funding for the Acquisition and Maintenance of the Subject Properties

The funds used to acquire the Subject Properties and pay property-related expenses were provided by both Vekselberg and Voronchenko entities. Specifically, Vekselberg utilized existing entities owned directly or indirectly by the Lamesa Foundation, of which he was the beneficiary, to provide funding to Medallion. *See* Hinton Report Table 4 (showing economic contributions by Vekselberg- and Voronchenko entities); Ex. 6 at Response to Interrogatory No. 3. Voronchenko used entities owned by the Transoceanic Trust, of which he was a beneficiary, and other related entities, Ex. 6 at Responses to Interrogatories 3, 4, 8, to provide funding to Medallion.

These respective groups of entities both loaned funds to Medallion, which then made payments for the purchases of the Subject Properties, as well as payments for property-related expenses. *See* Hinton Report ¶ 35. The specific entities associated with Vekselberg and Voronchenko that contributed funds are listed below.

| Voronchenko-related Entities | Vekselberg-related Entities |
|---|---|
| Chestergate Inter Invest LTD | Grierson Investing Corp. |
| Grant Overseas SA | Kadosa International Ltd. |
| Hermitage SA | Lamesa Finance Inc. |
| Kanton Limited | Lamesa Group Holding SA* |
| Kronable Commercial Corp. | |
| Smile Holding Limited | |
| The Transoceanic Trust | |
| Maui Peaks Corp.** | |

*See* Hinton Report at 15, Table 1. A summary of the loan agreements used to fund Medallion showing the entity making the loans and the amount of the loan is provided below:

| Date | Borrower | Lender Entity Name | Lender Entity Relation | Initial Loan Facility Amount | Total Drawdowns | Total Repayments | Drawdowns Less Repayments | Interest Rate |
|---|---|---|---|---|---|---|---|---|
| 2/11/2008 | Grierson | Smile Holding Limited | Voronchenko | $11,500,000 | $9,250,000 | $0 | $9,250,000 | 0% |
| 2/11/2008 | Medallion | Grierson Investing Corp. | Vekselberg | $25,000,000 | $20,737,000 | $0 | $20,737,000 | 3% |
| 8/13/2009 | Medallion | Ridgeline International Ltd. (The Transoceanic Trust) | Voronchenko | $1,000,000 | $1,062,000 | $0 | $1,062,000 | 1% |
| 6/29/2010 | Medallion | Ridgeline International Ltd. (The Transoceanic Trust) | Voronchenko | $6,500,000 | $5,500,000 | $0 | $5,500,000 | 0% |
| 3/4/2011 | Medallion | Lamesa Finance Inc. | Vekselberg | $1,000,000 | $7,137,278 | $475,375 | $6,661,903 | 0% |
| 4/28/2011 | Medallion | Kanton Limited | Voronchenko | $500,000 | $500,000 | $0 | $500,000 | 1% |
| 7/20/2011 | Medallion | Kanton Limited | Voronchenko | $2,000,000 | $2,000,000 | $0 | $2,000,000 | 1% |
| 12/4/2012 | Medallion | Ridgeline International Ltd. (The Transoceanic Trust) | Voronchenko | $900,000 | $900,000 | $0 | $900,000 | 3% |
| 4/7/2014 | Medallion | Maui Peaks Corp. | Voronchenko | $8,750,000 | $8,750,000 | $0 | $8,750,000 | 2% |
| 8/19/2014 | Kronable | Medallion | Medallion | $2,100,000 | $2,100,000 | $3,639,957 | -$1,539,957 | 4% |
| 12/23/2014 | Medallion | Lamesa Group Holding SA | Vekselberg | $50,000,000 | $34,829,058 | $8,918,953 | $25,910,105 | 0% |
| 3/29/2017 | Medallion | Grant Overseas SA | Voronchenko | $500,000 | $249,994 | $0 | $249,994 | 2% |
| 8/7/2017 | Medallion | Smile Holding Limited | Voronchenko | $500,000 | $250,000 | $0 | $250,000 | 2% |
| 11/14/2017 | Medallion | Grant Overseas SA | Voronchenko | $500,000 | $499,994 | $0 | $499,994 | 0% |

*See* Hinton Report at 17, Table 2. Unlike traditional mortgages that are secured by the property acquired with the loaned funds, these loan agreements were unsecured, nor did they define periodic repayments. *See id.* ¶ 37. The interest rates are also below the rate used for typical residential mortgages, ranging from 0% to 4%. *Id.*

Medallion pooled the funds it received through these loan agreements into a UBS bank account, its primary repository of funds. *See id.* ¶ 67. In addition to using this account to purchase the Subject Properties, the Medallion UBS account made direct payments to contractors and

suppliers (including for construction, furnishings, and design services), as well as payments to service providers such as A.J.K. Consultants, and loan repayments. *Id.* ¶ 68.

Medallion also hired U.S.-based attorney Robert Wise to, among other things, purchase properties and make expenditures on behalf of Medallion. *Id.* ¶¶ 69-70. Wise had a longstanding relationship representing Voronchenko prior to his engagement with Medallion, Ex. 72, and Wise billed Voronchenko for his work on behalf of Medallion—the bills were sent to Voronchenko through his son Sergey, Exs. 73, 74. Voronchenko also directed Wise through intermediaries to cut checks for his purchases for the Subject Properties. Exs. 75-76.

Before Vekselberg's designation, Wise administered payments relating to the ownership, maintenance, and repair of Medallion's properties and other Medallion expenses by using his Interest on Lawyers' Trust Account ("IOLTA"). Hinton Report ¶ 70. Specifically, Medallion regularly transferred funds from its UBS account to Wise's IOLTA account, from which Wise would disburse funds for property-related expenses and other expenses upon authorization from Medallion. *Id.* Wise received over $8.6 million into his IOLTA account from Medallion's UBS account from 2009 through April 6, 2018. *Id.* ¶ 71. Wise used these funds to pay for expenses related to the Subject Properties and other expenses. *Id.* at 38, Table 3 Notes.

With regard to Voxi and payments towards the Penthouse, Wise also played a role. *Id.* ¶ 73. Specifically, Voxi entered an agreement with Wise in August 2017 under which Voxi would periodically transfer funds to Wise's IOLTA account to be used to pay, among other things, expenses for the ownership, maintenance, and repair of the Penthouse. *Id.*; Ex. 77 at US_00034237.

### E. Vekselberg's Designation as an SDN on April 6, 2018

On April 6, 2018, OFAC designated Vekselberg as an SDN. Exs. 37, 78. As a result of that designation, Vekselberg's property and interests in property were blocked under U.S. sanctions laws.

Voronchenko, as a close friend and business partner of Vekselberg, learned that Vekselberg had been sanctioned, just after it happened. As Claimants' Rule 30(b)(6) representative Alexander Linnikov testified, on account of their close friendship, Voronchenko learned that Vekselberg had been sanctioned "probably [] immediately after he was listed, [as] . . . that information was -- everything was available to Mr. Voronchenko immediately." Ex. 38 at 259:12-16; *id.* at 260:2-6 ("Q. Okay. So just to summarize, it sounds like Vladimir and Sergei Voronchenko, being very close with Mr. Vekselberg, were aware that he had been sanctioned immediately after it happened? A. Probably so."). Voronchenko's knowledge of the U.S. sanctions on Vekselberg is also corroborated through WhatsApp and Signal messages he sent to an associate ("Associate-1"). For example, in December 2018, Voronchenko sent Associate-1 a link to an article discussing Vekselberg's sanctions designation. Fannon Decl. ¶ 2(b) & Exs. B, B-1, and B-T. In addition, earlier that same year, approximately a month after Vekselberg's designation, Voronchenko sent a WhatsApp message to Associate-1 with a link to the website of a law firm in Washington, D.C., the website of which identified the law firm as specializing in OFAC sanctions *See* Fannon Decl. ¶ 2(a) & Exs. A, A-1 and A-T.

### F. Post-Sanctions Transactions Related to the Subject Properties

#### 1. Post-Sanctions Transfers Used To Pay for Expenses Relating to the Subject Properties

After Vekselberg was sanctioned on April 6, 2018, the manner in which Medallion and Voxi received funds to pay for expenses, including expenses related to the Subject Properties,

abruptly changed. Whereas Medallion and Voxi previously paid for expenses through funds obtained via unsecured loans from both Vekselberg entities and Voronchenko entities, *see supra* SOF § D.5, after April 6, 2018, all funding for the expenses of the Subject Properties and other expenses was provided from two Voronchenko sources. The first source was Smile, an entity owned 100% by Transoceanic, a Voronchenko family trust.[13] Smile provided funding from its bank account in the Bahamas. Ex. 80; Ex. 38 at 249:7-8. The second source of funding was Ilya Zlotnyk, one of Voronchenko's family members. Ex. 70 at Response to Interrogatory 7; Ex. 38 at 305:6-9. Mr. Zlotnyk provided funds from his bank in Russia. Ex. 38 at 383:20-384:3; Ex. 70 at Responses to Interrogatory 16(a), 16(c), 16(h). As Claimants' representative Mr. Linnikov explained at his deposition:

> [A]fter April 6, 2018, entities associated with Mr. Vekselberg were no longer used; so we see Smile -- at this point, Smile was, apparently, still operational, and then it's a bank in the Bahamas. The payment that was sent by the bank in the Bahamas was probably more lax than other banks, and then there is the payment made by Mr. Zlotnik, a Voronchenko family member.

Ex. 38 at 249:5-12; *see also id.* at 251:8-18. Mr. Linnikov also testified that the reason for the change in the source of funding was Vekselberg's sanctioning. *Id.* at 251:3-251:7 ("when it was no longer possible to use the Medallion account, because of Medallion's association with Mr. Vekselberg's organization, alternative methods had to be found, and they were found").

Smile and Zlotnyk sent funds to the IOLTA account of Medallion/Voxi attorney Robert Wise, who in turn made payments relating to the properties and other expenses, just as he had prior to Vekselberg's designation. As reflected in Wise's QuickBooks records, Wise received a total of

[13] Vladimir Voronchenko is a beneficiary of the Transoceanic Trust, which owns 100 percent of Smile. *See* Ex. 6 at Response to Interrogatory 9 ("Medallion states that the ultimate beneficial owner of Smile from the date of its formation to the date of the filing of Medallion's claim on March 30, 2023, has been the Transoceanic Trust"); *Id.* at Response to Interrogatory 11 ("Medallion states that Transoceanic Trust owns 100% of Smile").

$3,614,904 from Smile and Zlotnyk for such expenditures after April 6, 2018. *See* Hinton Report at 67 (Table 12); Ex. 91; Exs. 92, 93. Voronchenko's family communicated with Wise regarding the payment of Medallion's expenses post-sanctions. Exs. 81, 83, 90. The Voronchenko family also had communications with Wise post-sanctions contemporaneous with the infusion of funds from both Smile[14] and Zlotnyk.[15]

In addition, Zlotnyk paid certain expenses directly from his bank account in Russia in the amount of $1,405,632.[16] In total, based on the information above, post-sanctions, Smile and Zlotnyk sent $5,088,099 in international wires for maintenance of the Subject Properties and other expenses. The Government's expert Paul Hinton associated these payments with each of the Subject Properties as follows:

[14] *See, e.g.*, Ex. 84 ([redacted] Ex. 85 [redacted] Ex. 86 [redacted] The same day, Smile sent Wise money.); *compare* Ex. 96 (showing corresponding wire transfers from Smile).

[15] *See, e.g.*, Ex. 87 [redacted] Ex. 88 [redacted] *compare* Exs. 94, 95 (showing corresponding wire transfers from Zlotnyk).

[16] The wires from Zlotnyk to pay direct expenses post-sanctions are summarized in a chart attached as Exhibit 94, which appends the records reflecting the underlying wire transfers.

| *Post-Sanctions, Before Medallion Transfer* *4/6/2018 - 8/26/2019* | Duck Pond | Park Avenue | Fisher Island Condo | Penthouse |
|---|---|---|---|---|
| **IOLTA Expenditures on Properties** | $267,259 | $74,958 | $247,614 | $45,895 |
| **International Transfers from Zlotnyk to Pay Property Expenses** | $74,461 | $0 | $0 | $59,947 |
| **Total by Property** | **$341,721** | **$74,958** | **$247,614** | **$105,842** |
| **Total** | **$770,135** | | | |
| *Post-Sanctions, After Medallion Transfer, Before Voxi* *8/27/2019 - 1/19/2022* | **Duck Pond** | **Park Avenue** | **Fisher Island Condo** | **Penthouse** |
| **IOLTA Expenditures on Properties** | $742,035 | $730,461 | $1,156,416 | $49,029 |
| **International Transfers from Zlotnyk to Pay Property Expenses** | $0 | $0 | $0 | $1,271,224 |
| **Total by Property** | **$742,035** | **$730,461** | **$1,156,416** | **$1,320,253** |
| **Total** | **$3,949,164** | | | |
| *Post-Sanctions, After Voxi Transfer* *1/20/22 - 6/22/2022* | **Duck Pond** | **Park Avenue** | **Fisher Island Condo** | **Penthouse** |
| **IOLTA Expenditures on Properties** | $92,980 | $55,364 | $217,046 | $3,408 |
| **International Transfers from Zlotnyk to Pay Property Expenses** | $0 | $0 | $0 | $0 |
| **Total by Property** | **$92,980** | **$55,364** | **$217,046** | **$3,408** |
| **Total** | **$368,799** | | | |
| **Total Expenditures on Properties** | **$1,176,735** | **$860,783** | **$1,621,076** | **$1,429,503** |
| **Total** | **$5,088,099** | | | |

Hinton Report at 68 (Table 13). The backup for this chart is included with Hinton Report Workpaper B and is attached separately hereto for ease of reference as Exhibit 119; *see also* Ex. 91 (additional material supporting these calculations).

The Government has located records of four additional wire transfers that post-date the imposition of sanctions not included in the above table. These include three transfers totaling $16,974 from Zlotnyk to Wise's IOLTA account, and one transfer of $150,000 from Smile to Wise's IOLTA account. Thus, in total, Zlotnyk wired $494,463 to Wise's IOLTA account[17] after sanctions, and Smile wired $3,287,415 to Wise's IOLTA account[18] after sanctions. And as noted above, Zlotnyk paid certain expenses directly from his bank account in Russia in the amount of

[17] A chart reflecting all of Zlotnyk's wire transfers to Wise's IOLTA account post-sanctions is attached as Exhibit 96, appending the supporting documents referencing each wire transfer.

[18] A chart reflecting all of Smile's transfers to Wise's IOLTA account post-sanctions is attached as Exhibit 95, appending the supporting documents referencing each wire transfer.

$1,405,632 after sanctions. Ex. 94. Thus, in total, Zlotnyk and Smile wired $5,187,510 from international sources after the imposition of sanctions on Vekselberg.

The vast majority of these payments were for expenses related to the maintenance of the Subject Properties. The types of expenses covered by the table above include condo and building fees, taxes, insurance, legal fees, utilities, property management, maintenance, lifestyle, cable and telephone, tips for building staff, capital improvement, parking, auto insurance, auto registration, and home security, among others. *See* Ex. 119. $4,217,295 of the payments covered in Mr. Hinton's table were used for the following direct expenses of the Subject Properties: condo and building fees, taxes, homeowners' insurance policies, utilities, property management, maintenance, cable and telephone, capital improvement, and home security. A version of Mr. Hinton's table that includes only these categories of expenses is below:

| *Post-Sanctions, Before Medallion Transfer*<br>*4/6/2018 - 8/26/2019* | Duck Pond | Park Avenue | Fisher Island Condo | Penthouse |
|---|---|---|---|---|
| IOLTA Expenditures on Properties | $163,485 | $55,527 | $204,832 | $36,505 |
| International Transfers from Zlotnyk to Pay Property Expenses | $0 | $0 | $0 | $0 |
| **Total by Property** | **$163,485** | **$55,527** | **$204,832** | **$36,505** |
| **Total** | **$460,349** | | | |
| *Post-Sanctions, After Medallion Transfer, Before Voxi Transfer*<br>*8/27/2019 - 1/19/2022* | Duck Pond | Park Avenue | Fisher Island Condo | Penthouse |
| IOLTA Expenditures on Properties | $442,806 | $668,426 | $1,043,484 | $35,731 |
| International Transfers from Zlotnyk to Pay Property Expenses | $0 | $0 | $0 | $1,271,224 |
| **Total by Property** | **$442,806** | **$668,426** | **$1,043,484** | **$1,306,955** |
| **Total** | **$3,461,670** | | | |
| *Post-Sanctions, After Voxi Transfer*<br>*1/20/22 - 6/22/2022* | Duck Pond | Park Avenue | Fisher Island Condo | Penthouse |
| IOLTA Expenditures on Properties | $57,617 | $51,250 | $183,002 | $3,408 |
| International Transfers from Zlotnyk to Pay Property Expenses | $0 | $0 | $0 | $0 |
| **Total by Property** | **$57,617** | **$51,250** | **$183,002** | **$3,408** |
| **Total** | **$295,277** | | | |
| **Total Expenditures on Properties** | **$663,907** | **$775,202** | **$1,431,318** | **$1,346,869** |
| **Total** | **$4,217,295** | | | |

The data supporting this chart is summarized in Exhibit 120, and is derived from Wise's QuickBooks records for Medallion (Ex. 92) and Voxi (Ex. 93), as well as certain wires from Zlotnyk towards property expenses (Ex. 94, lines I-L).

**2. The Illegal Transfer of Ownership of Medallion to Smile**

In the weeks and months following Vekselberg's designation, the parties to the various financing arrangements that had provided funding to Medallion, *see supra* SOF § D.5, executed a coordinated series of transactions that consolidated Medallion's debts into an obligation owing to a single Voronchenko entity (Smile). Ultimately, that debt restructuring facilitated the 2019 illegal transfer of Medallion's equity from Vekselberg entity Lamesa Group to Voronchenko entity Smile. *See generally* Lorry Report ¶¶ 55-62, 118-46; Hinton Report ¶¶ 94-118; *see also* 31 C.F.R. § 589.210(a).

The series of transactions proceeded as follows. First, on April 30, 2018, less than a month after Vekselberg's designation, Medallion, Voxi, and Lamesa Group executed a Debt Assignment Agreement transferring $22,937,548 of the debt that Medallion owed to Lamesa Group to Voxi, making Voxi the new debtor. Ex. 107. The agreement has a stated effective date of May 1, 2017, approximately 12 months before it was signed, which corresponds to the date of the assignment of the Penthouse Purchase Agreement from Medallion to Voxi, *see supra* SOF § D.4. Ex. 69.

Second, on December 31, 2018, six simultaneous Debt Assignment Agreements moved all of Medallion's remaining debt obligations, totaling approximately $25 million, from their original lenders to Voronchenko entity Smile as the single consolidated creditor. *See* Lorry Report ¶ 58 & n.106-12 (citing debt assignment agreements). On that same day, Lamesa Group entered into a series of Set-Off Agreements designed to clear the remaining Lamesa-side debt (*i.e.*, debt obligations between various Lamesa entities) through a series of inter-company offsets. Exs. 108-

09. Also on the same date, Lamesa Group pledged 100% of its shares in Medallion to Smile as collateral under a separate Collateral Agreement. Ex. 45. The Collateral Agreement provided that, upon default of Medallion's now-consolidated debt to Smile, Lamesa Group would transfer full ownership of Medallion shares to Smile. *Id.* Notably, Lamesa Group received no consideration for this pledge of collateral derived from loans made years earlier that had all been (until this point) unsecured. *See* Lorry Report ¶ 131. The consolidated loans also allowed Smile to demand, at any point in time and at its discretion, full repayment of the consolidated loans. *See id.* ¶¶ 128-29.

Third, on July 10, 2019, Smile issued a "Repayment Notice" to Medallion demanding payment of $25,498,353 under the consolidated debt obligations, with a repayment deadline of August 9, 2019. Ex. 110. On August 12, 2019, Smile sent Medallion a "Final Notice." Ex. 111. When Medallion did not pay, Smile invoked the Collateral Agreement by sending Lamesa Group a notice of "Execution of Pledge," Ex. 112, and, on August 27, 2019, a Settlement Agreement was executed among Medallion, Lamesa Group, and Smile, pursuant to which 10,000 Medallion shares (100% of the issued share capital) were transferred from Vekselberg entity Lamesa Group to Voronchenko entity Smile in full satisfaction of the outstanding debt, Exs. 113, 114.

At his deposition, Medallion's corporate representative testified that this restructuring was motivated by the sanctions that had been imposed on Vekselberg.[19] Ex. 39 at 73:16-25 (transfer of Medallion's shares to a Voronchenko entity (Smile) occurred in 2019 "[i]n all probability for the

---

[19] After the completion of the restructuring, Medallion attempted to sell the Southhampton House and the Park Avenue Apartments. In August 2020, Medallion hired Sotheby's International Realty to market and sell the Southhampton House. Ex. 97. It was taken off the market in or around August 2021. Ex. 99; Ex. 100. In December 2021, Medallion hired Compass to market and sell the Park Avenue Apartments. Exs. 101, 102. The property was taken off the market in or around June 2022. Ex. 103. Medallion did not obtain an OFAC license to sell either property. Ex. 98.

fear of sanctions"); *id.* at 190:4-24 (parties entered April 30, 2018 debt assignment agreement to attempt to "distanc[e] themselves from sanctions risks").

**3. The Illegal Transfer of the Penthouse from Voxi to Voronchenko's Relative**

As described above, Voxi acquired and held title to the Fisher Island Penthouse, and Vekselberg entities owned Voxi. *See infra* SOF §§ C.5, D.4. In 2022, after the imposition of sanctions on Vekselberg, Voxi took steps to move ownership of the Penthouse away from Vekselberg to Voronchenko entities to bypass the sanctions imposed on Vekselberg and to facilitate the sale of the property. Specifically, on January 20, 2022, Lamesa Group entered into a Share Sale and Purchase Agreement transferring 100 percent of Voxi's shares to Ilya Zlotnyk, a relative of Voronchenko, for a stated purchase price of $10,000. Ex. 115. The $10,000 in consideration did not come anywhere near reflecting the value of the underlying real estate (the Penthouse) held by Voxi, which, as noted *supra*, had been purchased less than five years prior for approximately $31 million. Lorry Report ¶¶ 50, 112; Ex. 116. In connection with the transfer, and on that same day, Zlotnyk also granted Sergey an option to acquire 100 percent of Voxi's shares for $10,000. Ex. 117. As a result, the post-sanctions transfer moved ownership of Voxi, the entity holding the Penthouse from the Lamesa Group, a Vekselberg entity, to a Voronchenko relative, with Sergey receiving a direct contractual path to acquire Voxi and the Penthouse.

Like the Medallion transfer, the purpose of this transaction was to avoid sanctions, as Linnikov, Voxi's 30(b)(6) witness, explained:

> Q. Can you explain why on January 20, 2022, the shares of Voxi, the 10,000 shares, were transferred from Lamesa Group Holding SA to Mr. Zlotnik?
> A. Well, in this particular case, my understanding is that it had to do with the fear of sanctions.
> Q. What do you mean?
> A. Lamesa Group Holding is not a listed entity; so it's not sanctioned; however, it is associated with Mr. Vekselberg; so that – that almost automatically creates suspicions that the Lamesa Foundation may be a sanctioned entity; so in order to –

> this transfer, in my understanding, was done in order to – in order to avoid such suspicions . . .

Ex. 38 at 305:20-306:8; *see also id.* at 307:15-18 ("Q. So why were the shares transferred on January 20, 2022? A. And that was done, I believe, exactly for the fear -- for the fear of sanctions."). OFAC has not issued any license that would have permitted the Medallion transfer, the Voxi transfer, or any of the aforementioned maintenance payments. Ex. 98.

**G. The Indictment of Voronchenko and His Flight from Justice**

Voronchenko was served with a grand jury subpoena at 7100 Fisher Island Drive, Miami Beach, Florida 33109 on or about May 13, 2022. *See* Fannon Decl. ¶ 4. The grand jury subpoena required him to appear for testimony and provide documents on or about May 31, 2022. *Id.* On or about May 15, 2022, Voronchenko sent a Signal message to Associate-1 that contained a link to an article discussing the sanctions against Vekselberg. Fannon Decl. ¶ 2(c) & Exs. C, C-1, C-T. Instead of appearing as required by the grand jury subpoena, Voronchenko left the United States for Russia. *Id.* ¶¶ 5-6 Specifically, approximately nine days after receiving the grand jury subpoena, on or about May 22, 2022, Voronchenko took a flight, which had been booked that same day, from Miami, Florida, to Dubai, United Arab Emirates. *Id.* ¶ 5. Four days later, on May 26, 2022, Voronchenko flew from Dubai to Moscow, Russia. *Id.* Accordingly, Voronchenko did not appear before the grand jury on or about May 31, 2022, as required by the subpoena. *Id.* ¶ 6. Nor did he appear on two additional dates to which his appearance was adjourned, on or about June 14, 2022, and June 30, 2022. *Id.* Voronchenko still has not returned to the United States. *Id.* ¶ 7.

On or about February 7, 2023, a grand jury sitting in the Southern District of New York returned an indictment charging Voronchenko with (i) conspiracy to violate the IEEPA, in violation of 50 U.S.C. § 1705; Executive Order Nos. 13660, 13661, and 13662, and 31 C.F.R. § 589.201, (ii) substantive violation of the IEEPA, in violation of 50 U.S.C. § 1705; Executive

Orders 13660, 13661, and 13662, 31 C.F.R. § 589.201, and 18 U.S.C. § 2, (iii) conspiracy to commit international money laundering, in violation of 18 U.S.C. § 1956(h), (iv) substantive international money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2, and (v) contempt of court, in violation of 18 U.S.C. §§ 401(3) and 2 (the "Indictment"). *Id.* ¶ 8 & Ex. D.

On April 25, 2023, Robert Wise was charged with and pled guilty to conspiracy to commit international money laundering, in violation of 18 U.S.C. § 371, for engaging in international monetary transactions intended to promote violations of IEEPA by causing U.S. dollar payments to be made to maintain the Subject Properties in violation of the sanctions imposed on Vekselberg. *United States v. Robert Wise*, S1 23 Cr. 73 (MKV).

### H. The Government's Forfeiture Action

The Government filed a verified complaint seeking forfeiture of the Defendants-*in-rem* on February 24, 2023. ECF No. 1 (the "Complaint"). Notice of the Complaint was thereafter posted on the Defendants-*in-rem* and served on the titled property owners, Medallion and Voxi, pursuant to 18 U.S.C. § 985(c)(1). Medallion and Voxi each filed a claim on March 30, 2023, ECF Nos. 13, 14, and filed their respective answers on April 18, 2023, ECF Nos. 20, 21.[20]

The Complaint includes four forfeiture claims. The Government alleges that the Defendants-*in-rem* are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because they are property derived from proceeds traceable to a violation of IEEPA (Claim Two) and a conspiracy to violate IEEPA (Claim One). *See* ECF No. 1 ¶¶ 51-58. The Government also alleges that the Defendants-*in-rem* are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) as property involved

[20] Claims and answers were also filed by Palazzo del Sol / Della Luna at Fisher Island Condominium Association, Inc., Sunshine State Certificates VIII, LLLP, and Palazzo del Mare at Fisher Island Condominium Association No. One Association, Inc., asserting an interest in overdue condominium association fees and property taxes associated with the Defendants-*in-rem* located in Florida (collectively, the "Condominium Claims"). *See* ECF Nos. 18, 24, 29. This Motion does not address the validity of the Condominium Claims.

in international money laundering in promotion of the same IEEPA violations (Claim Three) and as property involved in a conspiracy to commit international money laundering or property of an entity involved in such a conspiracy (Claim Four). *See id.* ¶¶ 59-68.

## STATUTORY AND REGULATORY FRAMEWORK

### I. IEEPA

Enacted in 1977, IEEPA gives the President of the United States certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency and prescribes criminal penalties for violations. *See* 50 U.S.C. § 1701. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

On or about March 6, 2014, pursuant to his authority under IEEPA and the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*, the President issued Executive Order ("E.O.") 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660, pursuant to his authority under IEEPA and the NEA: E.O. 13661, E.O. 13662, and E.O. 13685. Together, these Executive Orders authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the

Russian Federation; against persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine. On May 8, 2014, OFAC adopted the Ukraine-/Russia-Related Sanctions Regulations ("the "URSR"), 31 C.F.R. Part 589, to implement these Executive Orders.

Executive Order 13662 provides that "[a]ll property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person" of any person determined by the Secretary of the Treasury to, among other things, operate in certain sectors of the Russian Federation economy, "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in," E.O. 13662 § 1(a); *see also* 31 C.F.R. § 589.201(a)(4), absent a license from OFAC authorizing the transaction, 31 C.F.R. §§ 589.201(d), 589.502. The property and interests in property of any entity owned, directly or indirectly, by a designated person are also blocked, regardless of whether the entity has also been separately designated. 31 C.F.R. § 589.411(a). Any transfer involving blocked property or property interests is null and void. 31 C.F.R. § 589.210(a).

Executive Order 13662 and the URSR also prohibit "the making of any contribution of funds, goods, or services by, to, or for the benefit of" a designated person or "the receipt of any contribution or provision of funds, goods, or services from" a designated person. E.O. 13662 § 4; *see also* 31 C.F.R. § 589.201(b). The term "services" refers to "the performance of something useful for a fee." *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004); *United States v. Banki*, 685 F.3d 99, 107-08 (2d Cir. 2012) (providing financial transfers without a fee is a "service"); *see also In re 650 Fifth Avenue & Related Props.*, No. 08 Civ. 10934(KBF), 2013 WL 5178677, at *23-24 (S.D.N.Y. Sept. 16, 2013), *vacated on other grounds*, 830 F.3d 66 (2d Cir. 2016) (concealing SDN's ownership of property is a "service"). Finally, Executive Order

13662 and the URSR prohibit "[a]ny transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate" their prohibitions, and "[a]ny conspiracy formed to violate any of" their prohibitions. E.O. 13662 § 5; *see also* 31 C.F.R. § 589.213.

On April 6, 2018, OFAC designated Vekselberg as a Specially Designated National ("SDN") pursuant to Executive Order 13662. Accordingly, the prohibitions in Executive Order 13662 and the URSR apply to Vekselberg and to any entity in which Vekselberg directly or indirectly owns a 50 percent or greater interest, meaning that (1) all of Vekselberg's and his entities' property and interests in property in the United States are blocked and (2) it is unlawful for any person to contribute or provide any funds or services to or for the benefit of Vekselberg or his entities.

## II. Forfeiture

Under 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" IEEPA "is subject to forfeiture to the United States." 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(D). The statute thus contains a "broad definition of 'proceeds'" including "property of any kind obtained directly or indirectly." *United States v. Seabrook*, 661 F. App'x 84, 86 (2d Cir. 2016) (quoting 18 U.S.C. § 981(a)(2)(A)). Proceeds are not limited to property initially obtained as a result of the crime, but also includes property that a party "retains" or "maintains" as a result of the offense. *United States v. Torres*, 703 F.3d 194, 200 (2d Cir. 2012); *see also United States v. Grant*, No. 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008) ("Proceeds are property that a person would not have but for the criminal offense."). This is a direct result of the broad nature of forfeiture and statutory language that "evinces an intent to reach all manner of property in the defendant's possession and fairly considered as derived from the crime of conviction." *Torres*, 703 F.3d at 199. "Stated otherwise,

so long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense." *Id.*

Under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of" the money laundering statutes, "or any property traceable to such property" is "subject to forfeiture to the United States." 18 U.S.C. § 981(a)(1)(A). Violations of IEEPA are "specified unlawful activity," 18 U.S.C. § 1956(c)(7)(D), and any international transfer of funds to or from the United States with the intent to promote the carrying on of IEEPA violations violates the money laundering statutes. 18 U.S.C. § 1956(a)(2). Property is forfeitable under § 981(a)(1)(A) where it has "been used to commit or facilitate a money laundering offense." *United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 487 (2d Cir. 1995); *see also United States v. Schlesinger*, 261 Fed. Appx. 355, 361 (2d Cir. 2008). "Facilitation of a laundering offense occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *In re 650 Fifth Avenue & Related Props.*, 777 F. Supp. 2d 529, 564 (S.D.N.Y. 2011) (quoting *United States v. Huber*, 404 F.3d 1047, 1060 (8th Cir. 2008)); *see also United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) ("Property would facilitate an offense if it makes the prohibited conduct less difficult or more or less free from obstruction or hindrance.").

## ARGUMENT

### I. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[a] party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(a). Under Rule 56(c), a court will grant a motion for summary judgment "if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Berger v. United States*, 87 F.3d 60, 65 (2d. Cir. 1996) "A fact is material . . . when it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (internal citation and quotation marks omitted). In determining whether summary judgment is appropriate, the Court must draw all inferences in favor of the nonmoving party. *United States v. Collado*, 348 F.3d 323, 327 (2d Cir. 2003). The moving party meets its burden "by showing that little or no evidence may be found in support of the non-moving party's case." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir. 1994).

Once the moving party has provided sufficient evidence to support a motion for summary judgment, "the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles." *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); *see also Golden Pac. Bancorp. v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004). The nonmoving party may not rely on conclusory allegations or speculation and must show that "its version of the events is not wholly fanciful." *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999). Evidence presented by the non-moving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it" should not be accepted by the court for purposes of defeating a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving

party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party."). "[T]he mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980); *see also Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) (conclusory and speculative responses cannot defeat adequately-pled motion for summary judgment). Such a dispute is not "genuine," and the party opposing summary judgment must show that there is more than a "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Id.* at 587.

## II. Discussion

As explained in more detail below, the Defendants-*in-rem* are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), as proceeds traceable to substantive violations of IEEPA and a conspiracy to commit the same, because, after sanctions were imposed on Vekselberg, Voronchenko and others made payments to maintain the Defendants-*in-rem*, which were still beneficially owned by Vekselberg, and also transferred ownership of Medallion and Voxi, the properties' shell company owners. The Defendants-*in-rem* are also subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property involved in international promotional money laundering and a conspiracy to commit the same because the maintenance payments were made via international wire transfers with the intent of maintaining the Defendants-*in-rem*, which were still beneficially owned by Vekselberg, in violation of IEEPA.

### A. The Defendants-*in-rem* Are Forfeitable as Proceeds of IEEPA Violations

The Government's first two forfeiture claims arise under 18 U.S.C. § 981(a)(1)(C), which subjects to forfeiture property that "constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C). Under Section 1956(c)(7), the term "specified unlawful activity" includes, among other things, violations of "section 206 (relating to penalties) of the International Emergency Economic Powers Act [i.e., 50 U.S.C. § 1705]." As noted above, 50 U.S.C. § 1705(a) makes it "unlawful . . . to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

Here, "there is no triable issue that the [Subject Properties] (1) either 'constitute[ ] . . . proceeds' or are 'derived from proceeds' that are (2) traceable to (3) a violation or a conspiracy to violate the relevant Executive Orders and implementing [regulations]." *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 88 (2d Cir. 2016) (quoting 18 U.S.C. § 981(a)(1)(C)).

#### 1. Voronchenko Violated and Conspired to Violate IEEPA

The factual record demonstrates that Voronchenko violated and conspired with others to violate IEEPA after April 6, 2018, by making payments to maintain the Subject Properties, which were illegal because they were (i) dealings in blocked property—the Subject Properties; (ii) the contribution and provision of funds and services to or for the benefit of Vekselberg by paying expenses for and maintaining the Subject Properties; and (iii) the contribution and provision of services to or for the benefit of Vekselberg by concealing his interest in the Subject Properties, thus protecting them from the consequences of blocking. Voronchenko and others also violated IEEPA by illegally transferring indirect ownership of the Subject Properties from Vekselberg to

Voronchenko by transferring Medallion and Voxi to Voronchenko's Smile entity and to a Voronchenko family member (respectively) through a series of transactions in 2018, 2019 and 2022.[21]

***Vekselberg Beneficially Owned and Controlled Medallion, Voxi, and the Subject Properties.*** It is undisputed that, at all relevant times, Medallion owned the Park Avenue Apartments, the Southhampton House, and the Fisher Island Condo, and that Voxi has owned the Fisher Island Penthouse since May 1, 2017 (following an assignment from Medallion). It is also undisputed that Medallion and Voxi were both ultimately owned by Vekselberg-related entities for over a year after Vekselberg was sanctioned, until at least August 27, 2019, and January 20, 2022, respectively. As described above, both Medallion and Voxi were ultimately owned by the Lamesa Foundation and the Foundation's exclusive beneficiary was LGI, a company wholly owned by Vekselberg. Accordingly, Vekselberg was the ultimate beneficial owner of the Subject Properties through this chain of entities. Indeed, both Medallion and Voxi represented as much on KYC forms to UBS. *See supra* SOF § C.2.[22] Medallion and Voronchenko also attested to Vekselberg's ownership of Medallion, including in a sworn affidavit, in depositions under oath, and in other written representations. *See supra id.*

Because Vekselberg was the sole beneficiary of the Lamesa Foundation, which in turn owned and controlled Medallion and Voxi, Vekselberg owned the Subject Properties or had

---

[21] Voronchenko's subsequent attempts to sell the Park Avenue Apartments and the Southhampton House in 2020 and 2021 are also IEEPA violations (although the Government is not seeking forfeiture of those properties based on those violations).

[22] If false, these representations would have been bank fraud. *See Matter of Seizure & Search of Motor Yacht Tango*, 597 F. Supp. 3d 149, 151 (D.D.C. 2022) ("deceiving banks which are trying to enforce such sanction programs is bank fraud [under] 18 U.S.C. § 1344"). But there is no reason to believe that Medallion or Voxi's representatives would have falsely claimed Vekselberg's ownership of the properties.

interests in the Subject Properties under IEEPA, Executive Order 13662, and the URSR. The URSR defines "property" to include "any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent," 31 C.F.R. § 589.331; and defines "interest in property" to include "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321. The President's authority under IEEPA to block property is expansive: "The interest need not be a legally protected one in order to be caught within the net of § 1702." *Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land II*"), 333 F.3d 156, 162-63 (D.C. Cir. 2003). Indeed, even a "beneficial interest" without legal ownership is within the scope of "interest" under IEEPA. *See id.* at 163; *see also Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 120 (2d Cir. 2010) (holding it is "reasonable for a court to hold that an individual has an interest in property, even when he does not own that property, so long as the property benefitted him as if he had received the property directly"); *Glob. Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) (rejecting argument that "the word 'interest' in § 1702(a)(1)(B) [refers only] to a *legal* interest, in the way that a trustee is legal owner of the corpus even if someone else enjoys the beneficial interest"). Accordingly, here, where Vekselberg was the sole beneficiary and beneficial owner of the entities that owned Medallion, Voxi, and the Subject Properties, it is clear that they were, for purposes of the relevant IEEPA regulations, Vekselberg's "property" or, at a minimum, property in which he had "interests." *See* 31 C.F.R. § 589.201(a).

***The Subject Properties Were Blocked.*** Because Vekselberg indirectly owned the Subject Properties and had an interest in the Subject Properties, they were blocked following his designation as an SDN on April 6, 2018. *See* E.O. 13662 § 2; 31 C.F.R. § 589.201. Moreover, the properties and property interests of all entities in which Vekselberg directly or indirectly owned a

50 percent or greater interest also became blocked.[23] *See* 31 C.F.R. § 589.411. Accordingly, the Subject Properties became blocked on April 6, 2018, by virtue of the fact that Vekselberg was indirectly their 100% beneficial owner at the time of his designation.[24]

***Voronchenko Engaged in, Conspired to Engage in, and Caused Prohibited Transactions.*** After OFAC designated Vekselberg in April 2018, Voronchenko (a U.S. person) violated and conspired with others, including his son Sergey, Vekselberg, and Medallion/Voxi attorney Robert Wise, to violate IEEPA by (1) engaging in payments to maintain the Subject Properties (which were located in the U.S.) and (2) transferring ownership of the Subject Properties from Vekselberg to Voronchenko by transferring ownership of those properties' shell company owners, Medallion and Voxi, which were themselves blocked. OFAC did not grant a license for any of these transactions.

***The Maintenance Payments Violated IEEPA.*** As discussed above, before OFAC designated Vekselberg as an SDN, Voronchenko, working with his son Sergey, Medallion and Voxi's attorney Robert Wise, and others, made payments to maintain the Subject Properties. Voronchenko and his co-conspirators directed the transfer of funds for the payment of the

---

[23] OFAC's fifty-percent rule, codified in 31 C.F.R. § 589.411, does not limit the reach of IEEPA, but rather extends it to automatically block any property and interests in property belonging to an entity owned, directly or indirectly, 50% or more by an SDN. *See* 31 C.F.R. § 589.411. This rule does not supersede or replace 31 C.F.R. Part 589's prohibition on providing "direct or indirect" benefit to or transacting with, transferring, or otherwise dealing in the "property" or "interests in property" of an entity or individual listed on the SDN List. 31 C.F.R. § 589.201.

[24] Consistent with this, OFAC determined that Medallion's property insurer, PURE, was subject to civil monetary penalties for violations of the Russian/Crimea Sanctions for collecting premium payments from Medallion post-sanctions because, "*as an entity owned by Vekselberg*, Medallion became a blocked person on April 6, 2018." Dep't of the Treasury, OFAC Settles with Privilege Underwriters Reciprocal Exchange for $466,200 Related to Apparent Violations of the Ukraine/Russia-Related Sanctions Regulations (Dec. 21, 2023), *available at* https://ofac.treasury.gov/media/932486/download?inline (last visited Nov. 24, 2026) (emphasis added).

properties' expenses, including tax payments, common charge payments, insurance premium payments, and other maintenance costs. *See supra* SOF § D.5. This activity continued after Vekselberg was designated, when the Subject Properties were blocked. Voronchenko continued to cause payments to be made for the maintenance of the properties. *See supra* SOF § F.1. These payments violated IEEPA not only because they "dealt in" blocked property, *see* E.O. 13662 § 1(a) & 31 C.F.R. § 589.201(a)(4); but also because payments made towards maintenance of the properties necessarily inured to the benefit of Vekselberg, their beneficial owner. *See* E.O. 13662 § 4(a) & 31 C.F.R. § 589.411(b)(1).

Voronchenko and his co-conspirators made these maintenance payments even though Voronchenko well knew that Vekselberg was the beneficial owner of the Subject Properties, *see* Ex. 2 at 9:9-18:13, and that Vekselberg had been designated, having learned about the sanctions imposed on Vekselberg shortly after they went into effect. *See supra* SOF § E.

Indeed, they took steps to conceal that these payments were being made in violation of IEEPA to properties that were still beneficially owned by Vekselberg. Specifically, in response to and because of the sanctions, Vekselberg entities stopped wiring funds to Wise's IOLTA account to maintain and operate the Subject Properties and instead the source of the funds used to maintain the Subject Properties was changed to two Voronchenko sources—Smile's bank account in the Bahamas and Ilya Zlotynk's bank account in Russia. *See* Ex. 38 at 242:15-245:2. Changing the source of the incoming funds, however, did nothing to address the underlying issue—the fact that the Subject Properties still remained blocked as property of Vekselberg. Rather, it was merely an attempt to avoid the detection of sanctions violations so as to permit the continued maintenance of the properties. In total, more than $4.2 million in maintenance payments were made after April 6, 2018, and no license for these payments was ever sought or obtained from OFAC.

***The Transfers of Medallion and Voxi Violated IEEPA.*** In 2019, after Vekselberg was sanctioned, Voronchenko, Vekselberg, Sergey, and others also directed the execution of a series of transactions designed to transfer the Subject Properties from Vekselberg entities to Voronchenko ones by transferring ownership of Medallion and Voxi, the properties' shell company owners. *See supra* SOF §§ F.2, F.3. These transfers of Medallion and Voxi violated IEEPA because, as discussed above, these companies and their real estate holdings (*i.e.*, the Subject Properties) were owned by Vekselberg and therefore blocked and could not be transferred or dealt in without a license from OFAC.

These transactions included execution of a series of debt assignment and off-set agreements that moved Medallion's remaining debt obligations into a single consolidated obligation to Smile (an entity 100% owned by a Voronchenko family trust), and a pledge by Lamesa Group of 100% of its shares in Medallion to Smile as collateral for no consideration. *See supra* SOF § F.2. This set the scene for what came next. In July 2019, Smile issued a repayment notice to Medallion demanding payment of the entire approximately $25.5M in consolidated debt obligations. When Medallion did not pay, Smile demanded and received the collateral, *i.e.*, Lamesa Group transferred all of the shares of Medallion to Smile to satisfy the outstanding debt.

Voronchenko, Vekselberg, Sergey, and others also directed the transfer of ownership of Voxi from the Vekselberg entities to Voronchenko's family member in an attempt to bypass the sanctions on Vekselberg. *See supra* SOF § F.3. In January 2022, Lamesa Group transferred 100% of the shares of Voxi to Voronchenko's relative Ilya Zlotnyk for $10,000 and Zlotnyk simultaneously granted Sergey an option to acquire all of Voxi's shares.

Because these transactions involved the "transfer" of or "otherwise dealt in" blocked entities and blocked property and were undertaken without a license from OFAC, they violated

IEEPA. *See* 31 C.F.R. § 589.201. Indeed, Claimants acknowledge these transactions were motivated by "fear of sanctions." Ex. 38 at 305:20-306:12; *see* Ex. 39 at 73:16-25, 190:4-24.

**2. The Subject Properties Are Proceeds Traceable to the IEEPA Violations**

The Subject Properties are forfeitable under § 981(a)(1)(C) because they are proceeds of the above-referenced IEEPA violations. First, the Subject Properties are proceeds traceable to Voronchenko's payments in violation of IEEPA because those payments maintained and improved the value of the Subject Properties. Voronchenko and his co-conspirators invested more than $4.2 million in the Subject Properties following Vekselberg's designation by OFAC. Second, the Subject Properties are proceeds traceable to Voronchenko's payments and concealment services in violation of the IEEPA, because Vekselberg was only able to retain the Subject Properties as a result of those payments and services. Third, the Subject Properties are the proceeds of the illegal transfer of indirect ownership from Vekselberg to Voronchenko in 2018, 2019 and 2022.

"Courts apply a 'but for' test to determine whether property constitutes proceeds of an offense." *In re 650 Fifth Ave. & Related Props.*, 2013 WL 5178677, at *27. Generally, for purposes of forfeiture, "proceeds are property that a person would not have but for the criminal offense . . . ." *Grant*, 2008 WL 4376365, at *2 n.1.

Under 18 U.S.C. § 981(a)(2)(A), proceeds, in the context of illegal services and unlawful activities, is defined as "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." In the instant case, the illegal services and unlawful activities are the IEEPA violating payments and illegal property transfers described above. The Second Circuit has held Section 981(a)(2)(A)'s gross proceeds definition applies when the underlying criminal conduct is "inherently unlawful." *See, e.g.*, *In re 650 Fifth Ave.*, 777 F.

Supp. 2d at 552. It has further recognized that "concealing ownership of assets"—as Voronchenko and his co-conspirators attempted to do here by changing the source of the incoming maintenance payments and transferring Medallion and Voxi from Vekselberg entities to Voronchenko entities—is never a legal activity and therefore "the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense." *Id.* The IEEPA violations at issue here are therefore inherently unlawful and therefore fit squarely within the broad definition of gross proceeds under Section 981(a)(2)(A).

Regardless, the applicable Executive Order imposes a sweeping prohibition on the provision of funds or goods to or for the benefit of an SDN. *See* E.O. 13662 § 4(a) ("The prohibitions in section 1 of this order include but are not limited to . . . (a) the making of any contribution or the provision of funds, goods, or services by, to, or for the benefit of any person whose property and interest in property are blocked pursuant to this order."). As such, *any* transaction that benefits an SDN is strictly prohibited, whether it is to purchase lawful or unlawful goods or services, and whether a net or gross definition of proceeds would apply. *See* 31 C.F.R. § 589.201(b)(1); 18 U.S.C. § 981(a)(2) (providing alternative definition of "proceeds" netting out direct costs incurred for "lawful goods or lawful services that are sold or provided in an illegal manner").

There are no facts in dispute that at least approximately $4.2 million in payments were made that benefited Vekselberg by preserving and improving his interests in the Defendants-*in-rem*. These payments, which were used for condo and building fees, taxes, insurance, utilities, property management, and other direct expenses of the Subject Properties were necessary to ensure that the properties remained in good condition and also free from encumbrances or foreclosures due to non-payment of taxes or common charges. This over $4.2 million in unlawful IEEPA

proceeds represents an investment in the Subject Properties and their value. "[P]roperty can be forfeited when fraud proceeds are used to pay for expenses or improvements to that property." *United States v. Kenner*, 443 F. Supp. 3d 354, 372 (E.D.N.Y. 2020) *citing Schlesinger*, 261 Fed. Appx. at 361.

These payments, and Voronchenko's concealment of Vekselberg's actual ownership, were also necessary for Vekselberg and Voronchenko to retain ownership and control of the Subject Properties. Put differently, the Defendants-*in-rem* as a whole were improved, maintained, and retained as a result of the IEEPA violations. But for the IEEPA-violating maintenance payments the Defendants-*in-rem* would have fallen into a state of disrepair or would have been placed at risk of being foreclosed upon by taxing authorities. Vekselberg, consequently, would not have retained those properties. Voronchenko's concealment of Vekselberg's ultimate ownership of the Subject Properties also helped Vekselberg avoid the consequences of the Subject Properties being treated as blocked—preventing any dealings in them. *See* 31 C.F.R. § 589.303 (with respect to blocked property, "payments, transfers, exportations, withdrawals, or other dealings may not be made or effected except pursuant to a license or other authorization from OFAC expressly authorizing such action"). The Defendants-*in-rem* are therefore forfeitable in their entirety as proceeds of illegal activity. The Second Circuit has held that forfeitable proceeds of an offense can include property "retained" and "maintained" as a result of the offense conduct.

> We do not accept that the omission of 'retained' or 'maintained' from § 981 evinces a Congressional intent not to reach property that is nonetheless 'traceable to' and constitutes 'net gain' of the defendant's fraud: Congress's inclusion of the broadening and attenuating language just quoted, as well as the use of the modifier 'indirectly,' easily offset the absence of the words 'retained' and 'maintained' from the statute. No more is required to support forfeiture under § 981.

*Torres*, 703 F. 3d at 200. For example, unpaid taxes that are retained as a result of the filing of false tax returns are proceeds of mail fraud or wire fraud. *See United States v. Yusuf*, 536 F.3d 178, 185, 189 (3d Cir. 2008) ("simply because funds are *originally* procured through *lawful* activity does not mean that one cannot thereafter convert those same funds into the 'proceeds' of an unlawful activity") (emphasis in original); *United States v. Morelli*, 169 F.3d 798, 806 (3d Cir. 1999). Likewise, property that is retained by concealing it from a bankruptcy court is proceeds of bankruptcy fraud. *See e.g.*, *United States v. Dennis*, 237 F.3d 1295, 1301-03 (11th Cir. 2001); *United States v. Ladum*, 141 F.3d 1328, 1340 (9th Cir. 1998); *United States v. Levine*, 970 F.2d 681, 686 (10th Cir. 1992) (sustaining money laundering conviction where the defendant concealed corporate tax refunds from bankruptcy court). *See also United States v. Frank*, 354 F.3d 910, 919 (8th Cir. 2004) (funds hidden from court to avoid paying restitution were proceeds of mail fraud, wire fraud and obstruction of justice); *Grant*, 2008 WL 4376365, at *1 (but for defendant's fraud, company would have been forced into bankruptcy and lost its trading rights; therefore, all income derived from the business thereafter was proceeds of the fraud).

Moreover, when Medallion and Voxi were transferred from the Vekselberg entities to Voronchenko's beneficial ownership in 2019 and 2022, respectively, the Subject Properties, in their entirety, became property that Voronchenko had his interest in only as a result of the illegal transfers—*i.e.*, proceeds of an IEEPA violation. Voronchenko and others engaged in the restructuring transactions of Medallion and Voxi after Vekselberg was designated by OFAC in an effort to obscure the true ownership of the Defendants-*in-rem* and to circumvent the sanctions imposed on Vekselberg. For that reason, too, the Defendants-*in-rem* are forfeitable as proceeds of the IEEPA violations. *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 550 ("In general, '[p]roceeds are

property that a person would not have but for the criminal offense. . . .'" (quoting *Grant*, 2008 WL 4376365, at *2 n. 1).

### B. The Defendants-*in-rem* Are Subject to Forfeiture as Property Involved in International Money Laundering and a Conspiracy to Commit the Same

The Government's third and fourth forfeiture claims arise under 18 U.S.C. § 981(a)(1)(A), which subjects to forfeiture any property involved in a money laundering violation or a conspiracy to commit the same. More specifically, under § 981(a)(1)(A) "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of this title or any property traceable to such property" is forfeitable. "To show that the property was 'involved in' such a transaction, the Government has the burden of proving that 'there was a substantial connection between the property and the offense.'" *In re 650 Fifth Ave. & Related Props.*, 830 F.3d at 95-96 (citations omitted). "Under the substantial connection test, the property either must be used or intended to be used to commit a crime, or must facilitate the commission of a crime . . . [a]t minimum, the property must have more than an incidental or fortuitous connection to criminal activity.'" *United States v. One Red 2003 Hummer H2 VIN: 5GRGN23U93H118675*, 234 F. Supp. 3d 415, 421 (W.D.N.Y. 2017); *United States v. Approximately Five Hundred Forty-One Thousand Nine Hundred Fifty-Three Dollars & Zero Cents*, No. 23-CV-9585 (MKB) (PK), 2025 WL 923412, at *8 (E.D.N.Y. Mar. 27, 2025); *see also United States v. Borromeo*, 995 F.2d 23, 26 (4th Cir. 1993), *vacated in part on other grounds*, 1 F.3d 219 (4th Cir. 1993)) (courts have recognized that the "hurdle imposed by the 'substantial connection' requirement is not . . . a particularly high one."). In the present case, there is an overwhelming connection between the Defendants-*in-rem* and the IEEPA violation, *i.e.*, the use of the internationally transported funds to pay for the maintenance and upkeep of the Defendants-*in-rem.*

Under 18 U.S.C. § 1956(a)(2)(A)—the international promotional money laundering statute—the transmission of funds to, from, or through the United States "with the intent to promote the carrying on of specified unlawful activity" is prohibited. As discussed above, IEEPA violations are "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D). "Knowledge of unlawful activity—or intent to carry out an unlawful activity—is an element of [international promotional money laundering] . . . . To secure summary judgment based on international money laundering, [in violation of 18 U.S.C. § 1956(a)(2)(A),] the Government must show, *inter alia*, no genuine dispute that the Claimants . . . intended to promote the carrying on of a specified unlawful activity," which in this case was the IEEPA violation. *In re 650 Fifth Ave. & Related Props.,* 830 F.3d at 96 (citations omitted).

Voronchenko and his co-conspirators engaged in and caused (1) the transfer (or attempted transfer) of a monetary instrument or funds, (2) to a place in the United States from or through a place outside the United States, and (3) an intent to promote the carrying on of specified unlawful activity. *E.g.*, *United States v. Pierce*, 224 F.3d 158, 162 (2d Cir. 2000).

**1. Voronchenko and Other Conspirators Engaged in International Promotional Money Laundering**

There is no dispute that, after Vekselberg was sanctioned, Voronchenko, Sergey, Wise, and others caused the transfer of more than $4.2 million from outside the United States to a place inside the United States. *See supra* SOF § F.1. Moreover, there is also an abundance of evidence to show that the international transfer of those funds was intended to promote the IEEPA violations, *i.e.* the provision of a service/benefit (the payment of the maintenance fees, taxes, etc. of the Defendants-*in-rem*) to an SDN, namely Vekselberg. As discussed above, the Defendants-*in-rem* were beneficially owned by Vekselberg, and therefore the international payments sent into the United States directly benefited Vekselberg because they were used to pay for expenses and

upkeep of properties, all in violation of IEEPA. Had those maintenance payments not been made then the properties would have gone into disrepair and/or been subject to foreclosure and other civil actions due to non-payment of taxes, all of which would have negatively affected Vekselberg's interest in the Defendants-*in-rem.* In short, the evidence undisputably establishes that when Voronchenko directed the transfer of millions of dollars into the U.S. for the maintenance of the properties, he knew that he was doing so at least in part for the benefit of Vekselberg, an SDN, and therefore was acting with the intent to promote and cause an IEEPA violation.

### 2. The Defendants-*in-rem* are Property Involved in International Promotional Money Laundering

It is well-settled that when a money laundering transaction—here, the international transmission of funds to and through the United States for the purpose of promoting the IEEPA violations—is made to support an asset such as a building, car, or business, that asset constitutes property "involved in" the money laundering offense. *See, e.g.*, *United States v. Miller*, 911 F.3d 229, 233 (4th Cir. 2018) (real properties were "involved in" money laundering given "the use of laundered funds to finance improvements to the [] properties . . . Although Miller places considerable weight on the fact that his properties were not *purchased* with laundered funds, the statutory test does not require so much. It requires only that property be 'involved in' money laundering transactions.") (emphasis in original). "Real property is involved in a money laundering offense if laundered funds are used to pay for improvements." *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 565-66 (cleaned up) (collecting cases); *see also United States v. Schlesinger*, 396 F. Supp. 2d 267, 272-73 (E.D.N.Y. 2005) (where laundered funds were used to pay business loan and make monthly tax payments on business real estate, the business and its real estate were "involved in" money laundering), *aff'd*, 261 Fed. Appx. 355 (2d Cir. 2008); *United States v. One 1987 Mercedes*

*Benz*, 820 F. Supp. 248, 252 (E.D. Va. 1993) (where one car payment was made with laundered funds, the car was "involved in" money laundering).

The undisputed facts here demonstrate that the approximately $4.2 million dollars in international transfers of funds into the United States that were caused by Voronchenko were used to pay for the maintenance and upkeep of the Defendants-*in-rem*. Those maintenance payments undoubtably caused the Defendants-*in-rem* to be "property involved" in the promotional money laundering offense.

Accordingly, the Defendants-*in-rem* are subject to forfeiture as property involved in promotional money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

## **CONCLUSION**

For these reasons, the Court should grant summary judgment to the United States.

Dated: New York, New York
November 20, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: *<u>/s/ Jennifer Jude</u>*
LAWRENCE H. FOGELMAN
JESSICA GREENWOOD
JENNIFER JUDE
LISABETH MENDOLA-D'ANDREA
JOSEPH ZABEL
*Assistant United States Attorneys*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the 15,000 word-count limitation provided by this Court's order dated November 24, 2026. *See* ECF No. 113 (memo endorsement). As measured by the word processing system used to prepare it, this memorandum contains 13,688 words. This count does not include words that appear in the figures and tables included within this memorandum, as those figures/tables are images whose words cannot be counted by the word processing system.